**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 11-cv-00605-CMA-BNB

KATHERINE HOLLSTEIN,

        Plaintiff,

v.

CALEEL & HAYDEN, LLC, d/b/a GLO PROFESSIONAL,

        Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

        This matter is before the Court on Defendant Caleel & Hayden, LLC's Motion for Summary Judgment (Doc. # 18), filed on December 23, 2011.  Pursuant to the allegations in her Complaint, Plaintiff Katherine Hollstein, a former employee of Defendant, brings three claims for relief: a Title VII discrimination claim brought under the Pregnancy Discrimination Act ("PDA"), a Family Medical Leave Act ("FMLA") interference claim, and an American with Disabilities Act ("ADA") failure to accommodate claim.  (Doc. # 1.)  Defendant has moved for summary judgment on all three claims.  For the following reasons, the Court grants Defendant's Motion.

## I. <u>BACKGROUND</u>

        The following facts are undisputed, unless otherwise noted.  Defendant produces and sells cosmetics and related goods and services.  Plaintiff began working for Defendant in May of 2003 in the customer service department in Denver, Colorado.

Five years later, Plaintiff accepted a position as an inside sales employee, which carried an increased base salary for Plaintiff and increased commission eligibility.  Plaintiff's job duties as an inside sales employee were to service and find new clients.  When she first accepted the position, she was required to travel one week out of every quarter.  Plaintiff mostly reported to Mary Butler, the Vice President of Sales, who was located in Denver, and occasionally to Krista Davis, who was located in California.  (Doc. # 18-6 at 7.)

In December of 2008, Plaintiff told Ms. Butler that she was pregnant.  On June 11, 2009, Plaintiff sent an email message, stating that she wanted to work until August 14, take maternity leave, and return to work 90 days later.  (Doc. # 18-11.)  Plaintiff signed an absence request form on July 9, 2009, which was approved by Ms. Butler five days later.  (Doc. # 18-12.)  While Plaintiff was on maternity leave, her physician sent a letter to Defendant requesting an extra month of leave for Plaintiff due to "anxiety complications in her pregnancy."  (Doc. # 18-13.)  Defendant promptly granted the request.

In November of 2009, while Plaintiff was still on maternity leave, Defendant increased the travel requirements for inside sales employees from one week per quarter to one week per month, effective January 1, 2010.[1]  Plaintiff's physician cleared Plaintiff

---

[1]  Plaintiff says that this fact is disputed, asserting that "[t]he new travel requirements were not actually implemented for the other sales consultants."  (Doc. # 22 at 4, ¶ 27.)  To support this proposition, Plaintiff cites to a portion of her deposition transcript that is not attached.  In her own statement of the facts section, Plaintiff admits that "[t]he travel requirements for her position had changed during the time she was on leave, and travel was now required one week per month."  (*Id.* at 8, ¶ 11.)  Ms. Butler has also submitted an affidavit attesting that Defendant "increased the amount of travel to customers it required from all inside sales employees" in November of 2009.  (Doc. # 18-2 at ¶ 24.)  As Plaintiff has submitted no evidence to actually refute Defendant's allegation that the travel requirements applied to all inside sales employees, the Court will consider this fact undisputed.

to return to work without restrictions as of December 4, 2009, and Plaintiff returned to work on that day.  (Doc. # 18-14.)  When she returned to work, Plaintiff was engaged in her regular sales activities, including contacting customers, informing her customers that she had returned to work, and finding out if her customers needed to purchase any products.

On December 17, 2009, Plaintiff received an email from Ms. Davis instructing her to book and coordinate her January travel.  Plaintiff responded that she had not booked any January travel because she was not mentally ready to leave her son for a week, and asked if she could defer traveling until March.  (Doc. # 18-16.)  Ms. Davis replied that traveling was part of the inside sales position and that the accounts in Plaintiff's territory had not been physically serviced by Plaintiff in over nine months.  The next day, Plaintiff responded to Ms. Davis as follows:

> I am sorry but when I accepted this position it was required that we travel 1 week out of every quarter.  And now that I have come back from mater-nity leave I am being told that we have to travel 1 week out of every month, if I would have known that it was going to require that we travel this much I would not of [sic] excepted [sic] the position.  Until we can come to an agreement on traveling I don't feel it's a good idea to make any arrangements.

(Doc. # 22-8 at 2.)  Ms. Butler, who was copied on the email message chain, chimed in that she was "in full agreement" with Ms. Davis.  Plaintiff spoke with Ms. Butler later that day.  During this conversation, Ms. Butler told Plaintiff to consider her situation over the weekend and decide whether she wanted to continue in the inside sales position with the additional travel requirements.  Ms. Butler also offered to let Plaintiff transfer back to the customer service department if she wanted to avoid the increased traveling requirements.

On December 21, 2009, the following Monday, Plaintiff did not arrive at the office to discuss the situation.  Ms. Butler then contacted Plaintiff and told her that, as of January 1, 2010, Plaintiff would be transferred to customer service because Ms. Butler could not trust Plaintiff to make travel arrangements.   (Doc. # 18-6 at 102:5-14.)  Ms. Butler sent an email message to Plaintiff confirming that Plaintiff would be reassigned to the customer service department.  Plaintiff responded, "thank you."  (Doc. # 18-17.)  An hour or so later, Plaintiff sent another email message, stating that she accepted the move to customer service, promising to be a good worker, and agreeing to put everything behind her.  (Doc. # 18-18.)

However, Plaintiff never returned to the customer service position.  Rather, on the morning of December 29, 2009, Plaintiff informed Sean Butler, the President of Defendant, that December 29, 2009 would be her last day.

During her deposition, Plaintiff was asked if she believed any other similarly situated employee was treated more favorably; she identified Diana Alegria, "Kim," and Angelina Woods.  (Doc. # 18-6 at 130:1-19; 139:2-20.)  According to Plaintiff, Ms. Alegria was treated more favorably because she was written up several times and missed a lot of work, but was not demoted.  (*Id.* at 130:17-19.)  Kim and Ms. Woods were allegedly treated more favorably because they were promoted to outside sales consultants, despite being in the inside sales position for less time than any of the other employees.  Additionally, Kim had allegedly missed two of her flights when traveling to service accounts, yet was still promoted.  (*Id.* at 139:14-20.)

## II. <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate if the moving party demonstrates that there is

"no genuine dispute as to any material fact" and that it is "entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the Court views the

evidence and all reasonable inferences therefrom in the light most favorable to the

nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)

(citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986)). A fact is "material" if, under the applicable substantive law, it is "essential

to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986)). A dispute of fact is "genuine" if "there is sufficient evidence on

each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing

*Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a

genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at

670-71. In attempting to meet that standard, a movant who does not bear the ultimate

burden of persuasion at trial does not need to disprove the other party's claim; rather,

the movant need simply point out to the court a lack of evidence for the other party on

an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*,

477 U.S. 317, 325 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving

party to "set forth specific facts showing that there is a genuine issue for trial."

*Anderson*, 477 U.S. at 256. The nonmoving party may not simply rest upon its

pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific

facts that would be admissible in evidence in the event of trial from which a rational trier

of fact could find for the nonmovant." *Adler*, 144 F.3d at 671.  "To accomplish this, the

facts must be identified by reference to affidavits, deposition transcripts, or specific

exhibits incorporated therein." *Id.*

## III.  DISCUSSION

### A.   PREGNANCY DISCRIMINATION ACT CLAIM

Title VII makes it unlawful for an employer to discriminate against any individual

with respect to the compensation, terms, conditions, or privileges of employment on

the basis of sex.  *See* 42 U.S.C.§ 2000e-2(a)(1).  In 1978, Congress expanded the

definition of what constitutes discrimination "on the basis of sex" by amending Title VII

to include the PDA, which prohibits employers from discriminating against employees

"on the basis of pregnancy, childbirth, or related medical conditions."  42 U.S.C.

§ 2000e(k).  In the Tenth Circuit, pregnancy discrimination claims are treated the same

way as other Title VII claims of disparate treatment.  *See Orr v. City of Albuquerque*,

531 F.3d 1210, 1214 (10th Cir. 2008); *Brown v. YRC Inc.*, No. 11-3001, 2012 WL

3064831, at *3 (10th Cir. July 30, 2012) (unpublished).

Because Plaintiff seeks to prove her intentional discrimination through

circumstantial evidence, the Court applies the familiar *McDonnell Douglas* burden-

shifting framework.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973);

*Orr*, 531 F.3d at 1214 (applying *McDonnell Douglas* to PDA claim).  Under *McDonnell*

*Douglas*, Plaintiff must first establish a *prima facie* case of discrimination by Defendant.

In order to establish a *prima face* case of pregnancy discrimination within this frame-

work, Plaintiff must show that (1) she belongs to a protected class; (2) she suffered an

6

adverse employment action; and (3) she was treated differently from similarly situated employees. *See Stanley v. Abacus Tech. Corp.*, 359 F. App'x 926, 928 (10th Cir. 2010).

Although the parties largely focus on whether Defendant's stated reason for transferring Plaintiff to the customer service department was pretext, the Court finds that Plaintiff has not established a *prima facie* case of discrimination because she does not belong to a protected class under the PDA.  On December 4, 2009, Plaintiff returned to work from maternity leave without incident.  It was not until December 21, 2009 that Defendant decided to transfer her to the customer service department.[2]  Thus, for Plaintiff to prevail on her PDA claim, she must show that she was discriminated against "on the basis of pregnancy, childbirth, or related medical conditions" when she was transferred on December 21, 2009.  Plaintiff appears to argue that she was protected by the PDA by virtue of the fact that she "had been pregnant and delivered a son." (Doc. # 22 at 15.)  However, unlike race or gender, which are also protected classifications under Title VII, pregnancy is not a permanent condition.  Thus, the fact that Plaintiff had recently been pregnant does not automatically mean that she was protected by the PDA at the time of the alleged discrimination, which occurred well after she gave birth.

---

[2]  It is not clear whether Plaintiff asserts that her transfer to the customer service department was an adverse employment action, or whether she is relying on her allegation that she was constructively discharged on December 29, 2011 to satisfy the adverse employment action element.  For purposes of this Order, the Court assumes that Plaintiff suffered an adverse employment action on December 21, 2009 when she was informed that she would be transferred to the customer service department.

Undoubtedly, the PDA prohibits employers from discriminating against employees on the basis of conditions related to pregnancy that occur after the actual pregnancy.   *See Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 544 (S.D.N.Y. 2009). However, the plain language of the PDA requires such related conditions to be "medical conditions."   42 U.S.C. § 2000e(k).   As Defendant points out, there is no evidence that Plaintiff was suffering any medical conditions related to her pregnancy when she was transferred to the customer service department.[3]   (Doc. # 30 at 7.)   Although Plaintiff suffered complications from her pregnancy that required her to request an extra month of maternity leave, she returned to work on December 4, 2009 **without restrictions**. (Doc. # 18-14.)

In the email message that she sent to Ms. Davis on December 17, 2009, Plaintiff said that she did not feel mentally prepared to leave her infant son for a week in January.   The Court finds that Plaintiff's desire to avoid leaving her infant son was not a "medical condition" within the meaning of the PDA.[4]   The PDA offers no protection to persons whose child-rearing choices interfere with requirements of their jobs.   *See Fejes v. Gilpin Ventures, Inc.,* 990 F. Supp. 1487, 1492 (D. Colo. 1997) (holding that "child rearing concerns after pregnancy are not medical conditions related to pregnancy or childbirth within the meaning of the PDA."); *Barnes v. Hewlett-Packard Co.*, 846

---

[3]   As discussed more extensively below, the absence of evidence that Plaintiff suffered from a medical condition related to her pregnancy also dooms her ADA claim.

[4]   Notably, there is no evidence that Plaintiff suffered from post-partum depression when she returned to work on December 4, 2009, as she appears to now claim.   *See Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 544 (S.D.N.Y. 2009) (holding that postpartum depression is a condition related to pregnancy).   To the contrary, Plaintiff's physician cleared her to return to work "without restrictions."

F. Supp. 442, 444 (D. Md. 1994) ("All pertinent authorities since the inception of the PDA are in accord that Title VII does not prohibit discrimination on the basis of child-rearing activities or parental leave."); *see also* H.Rep. No. 948, 95th Cong.2d Sess. (1978), reprinted, 1978 U.S. Code Cong. & Admin. News 4749, 4753 ("[I]f a woman wants to stay home to take care of the child, no benefits must be paid because this is not a medically determined condition related to pregnancy."). Given the absence of any evidence showing that Plaintiff suffered a medical condition related to her pregnancy when she returned to work, the Court finds that Plaintiff did not belong to a protected class.[5] *See Falk v. City of Glendale*, No. 12-cv-00925, 2012 WL 2390556, at *3 (D. Colo. June 25, 2012) (unpublished) (dismissing PDA claim because the plaintiff was not a member of a protected class).

Even assuming *arguendo* that Plaintiff belonged to a protected class under the PDA, she has also failed to provide evidence that she was treated differently than any similarly situated employees. Although Plaintiff alleges that other employees were treated more favorably because they received promotions, there is no evidence that any other employee refused specific instructions to book and coordinate travel as Plaintiff did. There is also no evidence than any other employee was permitted to defer travel after the new travel policy was implemented in November of 2009. Because Plaintiff has failed to establish a *prima facie* case of discrimination under the PDA, the Court

---

[5] Furthermore, there is no evidence that Defendant's alleged discriminatory conduct was related to Plaintiff's absence from the workplace. Rather, it is undisputed that Plaintiff was engaged in her regular sales activities when she returned from work. (Doc. # 18, ¶ 32.) Problems arose only after Plaintiff requested to defer her January travel to March. Thus, there is no evidence that Defendant's decision to transfer Plaintiff to the customer service department was related in any way to Plaintiff's pregnancy, childbirth, or medical conditions related to her pregnancy.

need not determine whether Defendant's articulated reason for her demotion was pretext.[6]

## B.    FAMILY MEDICAL LEAVE ACT CLAIM

Plaintiff alleges that Defendant violated the FMLA by failing to restore Plaintiff to her position following her exercise of FMLA leave.  (Doc. # 1, ¶ 27.)  The FMLA guarantees up to twelve weeks of unpaid leave for eligible employees and reinstatement to the former position or an equivalent one upon return from that leave. 29 U.S.C. §§ 2612(1)(1), 2614(a).  Under the FMLA, an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]."  *Id.* § 2615(a)(1).  Although Plaintiff does not allege that Defendant interfered with her right to take leave in the first place, the Tenth Circuit has construed "failure to restore" claims as a specific type of interference claim in which the employer is alleged to have interfered with the right of reinstatement.  *Peterson v. Exide Technologies*, No. 11-3077, 2012 WL 1184001, at *6 (10th Cir. Apr. 10, 2012) (unpublished); *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004).

When Plaintiff returned to work after taking medical leave, she returned to a position with increased travel requirements.  However, "[a]n employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."  *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006) (quoting

---

[6]   The parties also dispute whether Plaintiff was constructively discharged.  The Court need not resolve this dispute because it is a component of Plaintiff's PDA claim, which fails for the reasons discussed above.

29 C.F.R. § 825.216(a); *see also* 29 U.S.C. § 2614(a)(3)(B) ("Nothing in this section shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.").  Thus, Defendant may defend by showing that the interference was unrelated to the taking of FMLA leave. *See Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1289 (10th Cir. 2007). Here, the increase in travel requirements applied to all inside sales employees.  Thus, if Plaintiff had not taken FMLA leave she still would have been subject to the new policy. Accordingly, the increase in travel requirements cannot support her FMLA interference claim.

Additionally, Plaintiff claims that her pay was substantially decreased when she returned from maternity leave, from $17.33 per hour to approximately $8.65 per hour. (Doc. # 22-2.)  However, as Defendant correctly notes, Plaintiff's allegation concerning her reduction in pay is not included in either her Complaint or in her EEOC charge. (*See* Doc. # 1; Doc. # 18-23.)  The Federal Rules of Civil Procedure do not "permit plaintiffs to wait until the last minute to ascertain and refine the theories on which they intend to build their case."  *Orr v. City of Albuquerque*, 417 F.3d 1144, 1153 (10th Cir. 2005) (quoting *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1091 (10th Cir. 1991); *see also Lawmaster v. Ward*, 125 F.3d 1341, 1346 n.2 (10th Cir. 1997) (refusing to consider claim not raised in the complaint).  As such, Plaintiff's new claim is properly considered as a request to amend the complaint.  *See Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 790 n.9 (10th Cir. 1998) ("Issues raised for the first time in a plaintiff's response to

a motion for summary judgment may be considered a request to amend the complaint, pursuant to Fed. R. Civ. P. 15.").

Although the Federal Rules of Civil Procedure provide that the Court should grant leave to amend "freely . . . when justice so requires," *see* Fed. R. Civ. P 15(a)(2), the Court must first determine whether amendment is within the deadline prescribed by the Scheduling Order.  Here, the Scheduling Order provides that the deadline for amendment of pleadings was June 25, 2011.  (Doc. # 13 at 11.)  Thus, the motion to amend is untimely.  Courts in this district often resolve untimely motions to amend by considering whether the party seeking to amend has shown "good cause" under Fed. R. Civ. P. 16(b)(4).  *See, e.g.*, *Colo. Visionary Acad. v. Medtronic, Inc.*, 194 F.R.D. 684, 688 (D. Colo. 2000) (denying an untimely motion to amend solely on the basis of a failure to establish ' good cause' within the meaning of Rule 16(b)(4)); *Nicastle v. Adams Ctny. Sheriff's Office*, No. 10-cv-00816, 2011 WL 1465586, at *3 (D. Colo. Mar. 14, 2011), adopted by 2011 WL 1464588 (Apr. 18, 2011) (unpublished decisions) ("Because the Court finds no good cause to amend the scheduling order, [it] will not address whether leave to amend is appropriate under Rule 15.").  Plaintiff has not acknowledged that she is raising a new issue in her response to summary judgment, much less explained why she did not assert this claim in a timely manner.  Thus, Plaintiff has not shown "good cause" for her failure to amend the Complaint in a timely manner, and Plaintiff's claim can be dismissed on this basis alone.

Even if Plaintiff had shown good cause for failure to amend within the deadline prescribed by the Scheduling Order, the Court would still deny the motion to amend as futile.  The only evidence submitted by Plaintiff that her pay was decreased from

$17.33 per hour to approximately $8.65 per hour is her own self-serving affidavit.[7]
(Doc. # 22-2.)  The Court concludes that Plaintiff's affidavit, submitted contemp-
oraneously with her response to summary judgment, "constitutes an attempt to create
a sham fact issue." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1996).

First, Plaintiff does not mention this alleged reduction in pay in the portions of
her deposition submitted to the Court, nor did she make any such allegations in either
her Complaint or her EEOC charge.  The Court finds it inconceivable that Plaintiff simply
forgot that her pay was cut in half; rather, the only logical explanation is that Plaintiff
is attempting to drum up a sham factual issue at the last instant to evade summary
judgment.  Second, the alleged reduction in pay is inconsistent with other allegations in
the Complaint and Plaintiff's statement of facts.  In her Complaint, Plaintiff alleged that
the proposed transfer to the customer service department would have resulted in
a reduction in pay.  (Doc. # 1.)  In her statement of additional facts section of her
summary judgment response, Plaintiff asserts that her pay upon returning to the
customer service department would have been $14.70 per hour.  (Doc. # 22 at 10,
¶ 32; Doc. # 22-4.)  If Plaintiff's pay had actually been reduced to $8.65 per hour upon
returning from maternity leave, a wage of $14.70 would be considered a raise, not a
reduction.  Disregarding Plaintiff's sham affidavit, the Court finds that there is no
evidence supporting Plaintiff's allegation that her pay was reduced upon returning from
FMLA leave, and the Court therefore denies Plaintiff's motion to amend her complaint
as futile.

---

[7]  Plaintiff also submits an unsigned "Revised Compensation Plan" that is dated September 1,
2009.  The exhibit does not include any information about Plaintiff's hourly wage.  (Doc. # 22-
10.)

Thus, summary judgment is appropriate on Plaintiff's FMLA interference claim.

## C.   AMERICANS WITH DISABILITIES ACT ("ADA") CLAIM

Plaintiff alleges that Defendant violated the ADA by failing "to make reasonable accommodations to the known physical or mental limitations of [Plaintiff], an otherwise qualified individual with a disability." (Doc. # 1, ¶ 32.) "The ADA prohibits discrimination against a 'qualified individual' with a disability on the basis of the disability." *Valdez v. McGill*, 462 F. App'x 814, 817 (10th Cir. 2012) (quoting 42 U.S.C. § 12112(a)). Discrimination includes an employer's failure to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual. *Id.* To establish a *prima facie* case of discrimination under the ADA, Plaintiff must show: (1) that she is disabled within the meaning of the ADA; (2) that she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) that she was discriminated against because of her disability. *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1188 (10th Cir. 2003). Here, Plaintiff cannot get past the first requirement of the *prima facie* test because she has not shown that she is disabled within the meaning of the ADA.

Under the ADA, a disability is defined as a physical or mental impairment substantially limiting one or more of the major life activities of the individual, or a record of such an impairment, or being regarded as having such an impairment. *Steele v. Thiokol Corp.*, 241 F.3d 1248, 1253 (10th Cir. 2001). Plaintiff asserts that she is disabled because postpartum depression is a physical or a mental impairment within the meaning of the ADA. (Doc. # 22 at 19.) Plaintiff is correct that depression is a recognized physical or mental impairment under the ADA. *See Doyal v. Okla. Heart,*

*Inc.*, 213 F.3d 492, 495 (10th Cir. 2000) (finding that depression is an impairment); *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 539-540 (S.D.N.Y. 2009) (finding postpartum depression can be a disability under the ADA). However, as previously discussed, there is no evidence in the record that Plaintiff actually suffered from postpartum depression when she returned to work on December 4, 2009.

Moreover, even assuming *arguendo* that Plaintiff did suffer from postpartum depression, Plaintiff has presented no evidence showing that her depression substantially limited a major life activity.[8] *See Williams v. Hallmark Cards, Inc.*, 10 F. App'x 790, 792 (10th Cir. 2001) (affirming summary judgment where the plaintiff had presented no facts showing that his depression substantially limited a major life activity). Because Plaintiff has failed to show that she has a disability within the meaning of the ADA, summary judgment is appropriate on her ADA claim.

## IV.  CONCLUSION

Based on the foregoing, it is ORDERED that Defendant's Motion for Summary Judgment (Doc. # 18) be GRANTED.

It is FURTHER ORDERED that this case is DISMISSED WITH PREJUDICE, and the Final Trial Preparation Conference set for September 21, 2012, and the four-day Jury Trial set to commence on October 9, 2012, are VACATED.

---

[8]  "A plaintiff is substantially limited if unable to perform a major life activity the average person can perform or significantly restricted as to the condition, manner or duration under which he can perform the major life activity." *Williams*, 10 F. App'x at 792 n.2.  "In considering whether an impairment substantially limits a major life activity, the Court considers the impairment's nature and severity, its duration or expected duration, and its permanent or long-term impact." *Id.*

It is FURTHER ORDERED that Defendants shall have its costs by the filing of

a Bill of Costs with the Clerk of the Court within ten days of the entry of judgment.

Each party shall bear its own attorneys' fees.

DATED:  September __14__, 2012

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge